Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/20/2024 09:09 AM CDT

**State of Nebraska, appellee, v.
Deontae C. Rush, appellant.**
___ N.W.3d ___

Filed September 20, 2024.    No. S-23-076.

1. **Administrative Law: Statutes: Appeal and Error.** The meaning and interpretation of statutes and regulations are questions of law for which an appellate court resolves independently of the lower court's conclusion.
2. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.
3. **Trial: Evidence: Appeal and Error.** Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court, whose decision an appellate court will not reverse unless there is an abuse of discretion.
4. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. And where the facts are largely undisputed, the ultimate question is an issue of law.
5. **Appeal and Error.** Consideration of plain error occurs at the discretion of an appellate court.
6. **Motions for Mistrial: Appeal and Error.** The decision whether to grant a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion.
7. **Pretrial Procedure: Rules of Evidence.** The rules of evidence do not operate with full force at hearings before the judge to determine a preliminary question of the admissibility of evidence.

8. **Pretrial Procedure: Rules of Evidence: Statutes: Words and Phrases.** There is no statutory indication the reference to preliminary hearings in Neb. Rev. Stat. § 27-1101(4)(b) (Reissue 2016) was meant to carry a special or limited meaning; thus, courts look to its ordinary meaning.

9. **Criminal Law: Rules of Evidence: Other Acts.** Neb. Rev. Stat. § 27-404(1) (Cum. Supp. 2022) operates as a broad exclusionary rule of relevant evidence that speaks to a criminal defendant's propensity to have committed the crime or crimes charged; meanwhile, § 27-404(2) operates as an inclusionary rule of evidence that provides that evidence that raises a propensity inference is admissible for other proper purposes, including proof of motive, intent, preparation, or absence of mistake or accident.

10. **Pretrial Procedure: Rules of Evidence: Other Acts: Legislature: Intent.** It was the manifest intention of the Legislature in Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022) that the question of whether a prior bad act is admissible at trial as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident be ruled on and finally determined before the jury learns of such evidence.

11. **Criminal Law: Pretrial Procedure: Rules of Evidence.** A hearing pursuant to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022) precedes the main discourse of a criminal case.

12. **Trial: Rules of Evidence: Other Acts: Appeal and Error.** A defendant must make an objection at trial to the offer of evidence of other crimes, wrongs, or acts, which was the subject of a hearing pursuant to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022), in order to preserve an alleged error in its admission during the trial.

13. **Pretrial Procedure: Rules of Evidence: Words and Phrases.** A hearing conducted under Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022) is a preliminary hearing for purposes of Neb. Rev. Stat. § 27-1101(4)(b) (Reissue 2016), exempting it from the evidence rules.

14. **Pretrial Procedure: Rules of Evidence: Hearsay: Judges.** In a hearing conducted pursuant to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022), the trial judge's experience and legal training can be relied on to inform crucial distinctions and to reveal the inherent weakness of evidence by hearsay.

15. **Evidence: Words and Phrases.** Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

16. **Evidence.** The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.

17. ____. Evidence is not irrelevant simply because there is other evidence admitted at trial supporting a similar inference.

18. **Prosecuting Attorneys: Evidence.** The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.

19. **Evidence: Stipulations.** A defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.

20. **Evidence.** Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party.

21. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

22. **Criminal Law: Evidence: Words and Phrases.** Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

23. **Evidence: Other Acts: Convictions.** When considering whether evidence of other acts is unfairly prejudicial, courts consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.

24. **Trial: Evidence: Motions to Suppress: Waiver: Appeal and Error.** The failure to object to evidence at trial, even if the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.

25. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.

26. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

27. **Criminal Law: Effectiveness of Counsel: Proof.** To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

28. **Effectiveness of Counsel: Presumptions.** In determining whether trial counsel's performance was deficient, courts give counsel's acts a strong presumption of reasonableness.

29. **Trial: Effectiveness of Counsel: Appeal and Error.** An appellate court will not judge an ineffectiveness of counsel claim in hindsight, and it will not second-guess trial counsel's reasonable strategic decisions.

30. **Trial: Attorney and Client.** The decision to object or not to object is part of trial strategy.

31. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

32. **Trial: Effectiveness of Counsel: Appeal and Error.** When considering the prejudice prong of ineffective assistance of counsel, appellate courts focus on whether a trial counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair.

33. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

34. **Effectiveness of Counsel: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal.

35. **Effectiveness of Counsel: Records: Appeal and Error.** When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, it is advisable for appellate counsel to specifically argue prejudice if appellate counsel believes the details in the trial record are sufficient to adequately review the question on direct appeal.

36. **Trial: Effectiveness of Counsel: Records: Appeal and Error.** Regardless of whether appellate counsel believes the details in the trial record are sufficient to adequately review the question, an appellant must make specific allegations on direct appeal of the conduct that the appellant claims constitutes deficient performance by trial counsel.

37. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

38. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution prohibit unreasonable searches and seizures.

39. **Constitutional Law: Search and Seizure: Words and Phrases.** A search under the Fourth Amendment occurs whenever an expectation of privacy that society is prepared to consider reasonable is infringed.

40. **Search and Seizure: Search Warrants: Probable Cause.** When an individual seeks to preserve something as private, and the individual's expectation of privacy is one that society is prepared to recognize as

reasonable, official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.

41. **Constitutional Law.** Under the third-party doctrine, depending on the nature of the particular documents sought, a person has no legitimate expectation of privacy in information voluntarily turned over to third parties, even if revealed on the assumption that it will be used only for a limited purpose.

42. **Constitutional Law: Telecommunications: Records.** A cell service customer does not have a reasonable expectation of privacy in the records maintained by a third-party service provider of the telephone numbers that text messages or calls were sent to or received from or in the times when those communications took place.

43. **Trial: Effectiveness of Counsel.** As a matter of law, counsel is not ineffective for failing to make an objection that has no merit.

44. **Witnesses: Testimony.** Questions about the extent of a witness' familiarity with the defendant's appearance go to the weight of the testimony and not its admissibility.

45. **Evidence: Appeal and Error.** The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

46. **Evidence: Photographs.** The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect.

47. ____: ____. A relevant photograph should not be excluded from evidence unless its prejudicial effect is greater than its probative value.

48. **Homicide: Evidence: Photographs.** In a homicide prosecution, photographs of a victim may be received into evidence for, among other things, purposes of identification.

49. **Homicide: Photographs.** A photograph of the victim of a homicide, taken before the alleged murder, is admissible for the purpose of identification, even if there exists no dispute over the identity of the deceased.

50. **Effectiveness of Counsel: Witnesses: Appeal and Error.** When the claim of ineffective assistance on direct appeal involves uncalled witnesses, vague assertions that counsel was deficient for failing to call "witnesses" are little more than placeholders and do not sufficiently preserve the claim.

51. **Effectiveness of Counsel: Postconviction: Witnesses: Appeal and Error.** Appellate counsel must give on direct appeal at least the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial counsel so that a postconviction court

may later identify whether a particular claim of failing to investigate a witness is the same one that was raised on direct appeal.

52. **Witnesses: Appeal and Error.** An appellate court does not need specific factual allegations as to what an uncalled person or persons would have said, which will not be found in the appellate record.

53. **Effectiveness of Counsel: Records: Appeal and Error.** The trial record reviewed on appeal is devoted to issues of guilt or innocence and does not usually address issues of counsel's performance.

54. **Effectiveness of Counsel: Appeal and Error.** It is not usually an appellant's allegations of prejudice that have guided review of ineffective assistance claims on direct appeal, but the allegations of deficient conduct.

55. **Motions for New Trial: Motions for Continuance.** A motion for new trial on the ground of surprise is properly overruled where a request for a continuance for that reason was not made at the trial.

56. **Trial: Prosecuting Attorneys.** In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. If the remarks are found to be improper, it is then necessary to determine whether the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

57. **Motions for Mistrial: Prosecuting Attorneys: Proof.** Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.

58. **Criminal Law: Motions for Mistrial.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

59. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. The relevant question for an appellate court in reviewing a criminal conviction for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

60. **Circumstantial Evidence.** Circumstantial evidence is entitled to be treated by the trier of fact in the same manner as direct evidence.

Appeal from the District Court for Lancaster County, KEVIN R. MCMANAMAN, Judge. Affirmed.

Sanford J. Pollack, of Pollack & Ball, L.L.C., and Alexander Kleinjan, Senior Certified Law Student, for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

The defendant was convicted by a jury of murder in the first degree and use of a firearm to commit a felony. He argues on appeal that the district court erred in making several evidentiary determinations and in failing to grant his motion for mistrial for prosecutorial misconduct during closing arguments. He also alleges several errors in relation to the failure to subpoena a law enforcement officer who took the report of a domestic assault that the defendant contends provided an alibi for the murder. The defendant makes numerous arguments of ineffective assistance of trial counsel, including that counsel was ineffective by failing to object to the admission of his cell site location information, which was obtained by a warrant that he argues was tainted by information obtained through an unconstitutional subpoena. Finally, the defendant asserts that the evidence adduced at trial was insufficient to find beyond a reasonable doubt that he used a firearm. We affirm.

## II. BACKGROUND

On March 1, 2021, law enforcement was dispatched to North 20th Street in Lincoln, Nebraska, after a neighbor reported that a door of a trailer home had been open for several days. After observing signs of a forced entry, officers entered the trailer and discovered James Shekie, deceased, lying on the floor with blood around his waist. An autopsy confirmed that Shekie died from a gunshot wound, which caused him to bleed to death.

## 1. Police Investigation and Charges

During a search of Shekie's trailer, law enforcement located several cell phones, which helped them identify Anna Feilen as a person of interest in Shekie's death. Officers located Feilen and transported her to the Lincoln Police Department, where she was interviewed. During the interview, Feilen implicated Deontae C. Rush and her biological brother, Marques Moten (Marques), in Shekie's murder.

While in custody, Feilen agreed to participate in a controlled call with Rush. Rush requested that Feilen take a video of her location to ensure the police were not involved. During the call, Rush was deleting messages as he typed them to Feilen. To preserve the communications, Feilen took screenshots of the messages, which showed Rush asking Feilen to "delete [her] side of the conversation" and "keep shut" and stating he had his alibi "covered."

Several days later, law enforcement located and arrested Rush in Chicago, Illinois. He denied any knowledge of or involvement in Shekie's murder.

The State charged Rush by information in the district court for Lancaster County, Nebraska, with first degree murder, a Class IA felony, and use of a firearm to commit a felony in violation of Neb. Rev. Stat. § 28-1205(1)(c) (Reissue 2016), a Class IC felony. The information alleged that Rush killed Shekie while committing or attempting to commit a robbery or burglary. Rush entered a not guilty plea to both charges.

## 2. Rush's Pretrial Motions

Before trial, Rush filed several motions to suppress, each of which related to evidence obtained from his cell phone, cell phone records, and social media accounts via a subpoena sent to Verizon Wireless (Verizon) and subsequent probable cause warrants.

### (a) First Motion to Suppress

In his first motion, Rush sought to suppress the cell phone records subpoenaed from Verizon. Rush claimed the State

was required to obtain a warrant before seizing his cell phone records, because a defendant has a reasonable expectation of privacy in his or her detailed physical movements. The State's subpoena had directed Verizon to produce subscriber information; call detail records; detailed text message records that excluded content; and, specifically, "IP Destination and Sessions Without Cell Site Information" for the time period between February 19 and March 9, 2021.

### (b) Second Motion to Suppress

In his second motion, Rush moved to suppress cell phone records later obtained from Verizon via a search warrant. He argued these records were improperly obtained, because the search warrant was tainted by an unlawful subpoena, the affidavit in support of the warrant did not establish probable cause, and the affidavit contained false and misleading information or material omissions.

The search warrant was issued by the Lancaster County Court on April 2, 2021. For two telephone numbers belonging to Marques and Rush, the search warrant demanded, among other things, subscriber information and all communications from February 20 to March 10, 2021, including cell calls and "tower locations and azimuth for the sectors accessed during the communication[s]." It also demanded "[a]ll content for SMS messages" for the same time period.

The affidavit supporting the search warrant detailed the discovery of Shekie's body and cellular devices in the home, which led to the identification of Feilen, who had told law enforcement that Marques and Rush had developed a plan to break into Shekie's home and take his marijuana. The affidavit further specified that on the day of the crime, Marques and Rush picked up Feilen and drove to Shekie's mobile home. Feilen observed that Rush had a firearm with him in the vehicle. When they arrived, Rush approached the back door of Shekie's home, forced the door open, and went inside, after which Feilen heard multiple gunshots and Shekie scream. The affidavit continued to describe events following

the shooting that implicated Rush in Shekie's death. The affidavit set forth that digital evidence obtained from Feilen's cell phone showed Feilen and Rush had communicated about the robbery before and after its commission. In one message, Rush told Feilen his cell phone number, and in another, Feilen provided Marques with Shekie's address.

The affidavit also referred to the results of the subpoena served on Verizon. Specifically, the results showed that Marques called Rush on February 23, 2021, at 12:40 a.m. and that Rush called Marques at 4:28 a.m. Marques and Rush also exchanged text messages on March 2.

Investigator Timothy Cronin, who prepared the affidavit, explained that in his training and experience, location data is maintained by the cell phone service provider, which in the present case could corroborate or disprove Rush's whereabouts on the date of the murder. Cronin also stated that cell phone service providers keep records of subscriber information, billing information, call lists, tower locations, text messages, and "GPS coordinates."

(c) Third Motion to Suppress

In a third motion to suppress, Rush sought to suppress all evidence obtained from a search warrant for his cell phone. Similarly to the second motion to suppress, Rush maintained that this evidence should be suppressed because the search warrant was tainted by an unlawful subpoena, the supporting affidavit did not establish probable cause, and the affidavit contained false and misleading information or material omissions.

The search warrant for a black Apple iPhone with a specified identification number was issued on April 2, 2021, by the Lancaster County Court. The warrant allowed for the search of messages, emails, data regarding internet usage, photographs, videos, and location information. The factual basis for the affidavit in support of the search warrant, also submitted by Cronin, was consistent with the affidavit supporting the warrant for the search of cellular records.

In the affidavit, Cronin elaborated, based on his training and experience, on the frequent use of electronic devices in criminal activity. He stated that digital storage devices, such as cell phones, "can be used to create, edit, delete, share, and store files and other data including, live and deleted documents, photographs, videos, electronic mail (e-mail), search history and other relevant user information." He further specified that such devices are often used to share data with others and that the information associated with that data may show, among other things, "evidence of current, on-going, future, and past criminal activity." He also explained that such data can be used to "identify and locate potential victims, witnesses, and co-conspirators."

### (d) Fourth Motion to Suppress

In his fourth motion to suppress, Rush moved to suppress all data from his Facebook social media account obtained via a search warrant issued by the Lancaster County Court on March 5, 2021. Rush claimed the evidence must be suppressed because the affidavit in support of the warrant did not establish probable cause and contained false or misleading information and material omissions.

The warrant allowed for the search of certain data associated with Rush's Facebook account, including location information, posts, photographs, videos, status updates, and messages for the time period of January 1 to March 4, 2021.

The affidavit supporting the search warrant, submitted by Investigator Christopher Schamber, recited facts consistent with the affidavits described above. In addition, Schamber stated in the affidavit that Feilen told law enforcement she communicated with Rush about the homicide through their Facebook accounts and that Feilen identified Rush's Facebook accounts by username and gave a description of his profile pictures.

### (e) Fifth Motion to Suppress

In his fifth motion, Rush moved to suppress all evidence obtained from his Snapchat social media account via a search

warrant issued by the Lancaster County Court on March 16, 2021. Rush again claimed the evidence must be suppressed because the affidavit in support of the warrant for his Snapchat account did not establish probable cause and contained false or misleading information and material omissions.

The search warrant allowed for the search of information associated with Rush's Snapchat account with the "user ID . . . tae402boy." This included the search of calls, messages, photographs, videos, and location information for the period of February 18 to March 10, 2021.

In support of the search warrant, the affidavit, signed by Investigator Lacey Reha, contained facts consistent with Cronin's affidavits described above. In addition, the affidavit stated that digital evidence from Feilen's cell phone shows that she and Rush communicated using Snapchat and that "[d]igital evidence identified . . . Rush's Snapchat user ID [as] tae402boy."

### 3. District Court's Resolution of Rush's Motions to Suppress

In a written order, the district court denied all five motions to suppress. With respect to Rush's first suppression motion regarding the subpoenaed records from Verizon, the court applied the third-party doctrine, which holds that a person does not have a reasonable expectation of privacy in information provided to third parties. The court concluded that Rush had no reasonable expectation of privacy in the subpoenaed records. The court recognized an exception to the third-party doctrine for cell phone records that provide a comprehensive chronicle of the user's physical location. However, because the subpoena excluded any cell site information or other data regarding Rush's physical location, the court determined that the subpoenaed records from Verizon did not involve a search for which a warrant was required.

The court overruled Rush's remaining motions to suppress on the ground that the search warrants were supported

by probable cause. It reasoned that the affidavits described substantial evidence that Rush shot and killed Shekie while attempting to steal Shekie's drugs. The court reasoned the affidavits showed that Rush communicated about the crime with his alleged accomplices using his cell phone and his Facebook and Snapchat accounts. Finally, the court found the affidavits showed a fair probability that evidence of a crime would be found on Rush's cell phone and in the records of Verizon, Facebook, and Snapchat.

### 4. Bad Acts Hearing

The State filed a pretrial "Notice of Intention to Use Evidence of Other Crimes, Wrongs, or Acts" pursuant to Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022). According to the notice, the State intended to offer at trial evidence obtained from Rush's cell phone indicating he was distributing marijuana.

Before trial, the court held a hearing on the State's motion. The State offered police reports indicating Shekie was murdered during a robbery of his drugs. The State also offered conversation threads from Rush's cell phone suggesting Rush was distributing marijuana in the weeks leading up to Shekie's death. The State believed this evidence would be relevant to show Rush's motive, intent, or plan to forcefully attempt to take marijuana from Shekie's home.

Rush objected to the police reports and conversation threads on hearsay grounds. According to Rush, the district court could not consider this evidence, because it contained hearsay statements. He argued that a bad acts hearing under § 27-404(3) (rule 404 hearing) is not a "preliminary examination[] or hearing[]" exempt from the Nebraska rules of evidence under Neb. Rev. Stat. § 27-1101(4)(b) (Reissue 2016).

The district court overruled Rush's hearsay objection on the ground that the rule 404 hearing was a preliminary hearing for purposes of § 27-1101(4)(b). Thus, the court received the police reports and conversation threads for the purpose of the rule 404 hearing.

In a subsequent written order, the court found that the State had proved by clear and convincing evidence that Rush was involved in selling marijuana at the time of Shekie's death.

## 5. Order Granting State's Motion for Mistrial

Rush's initial trial began on August 8, 2022. Both parties provided opening statements before the jury, and the State began its presentation of evidence. When the district court judge tested positive for COVID-19, the State filed a motion for mistrial due to the judge's ongoing illness and various logistical problems created by the delay. The jury was not sequestered.

The State set forth in the motion that if trial resumed on August 15, 2022, the jury would be outside the courtroom, unsequestered, for a full 6 days before trial resumed. The State claimed that if convicted, Rush would "certainly argue that the jury . . . had the opportunity to engage in jury misconduct or ha[d] . . . been exposed to improper influence given the media attention to this case." The State also asserted in the motion that it would not be able to secure several witnesses after August 19, which would impede its ability to execute its trial strategy and prove its case beyond a reasonable doubt. Defense counsel stipulated to the facts set forth in the motion and did not object to a mistrial. The court granted the State's motion.

## 6. Evidence at Jury Trial

Rush's new trial was scheduled for, and began on, October 28, 2022.

### (a) Testimony of Feilen

Feilen testified under a cooperation agreement with the State. In exchange for her truthful testimony, the State agreed to charge Feilen with conspiracy to commit robbery and not to pursue any additional charges against her related to Shekie's death.

Feilen grew up with her adoptive parents in Bellevue, Nebraska. She testified that she ran away from her adoptive home when she was 16 years old and made contact with her biological sister. After Feilen ran away from home a second time, Feilen's biological sister introduced her to Marques. Around this time, Feilen also met her biological mother, "Lisa." Feilen testified that she ran away from her adoptive home in Bellevue three times in total. At the time of trial, her adoptive parents lived in Arizona.

According to Feilen, Rush contacted her through Facebook in October 2020 when Feilen was 17 years old. Feilen went to visit Rush at his home in Omaha, Nebraska. The two had sex and smoked marijuana. Feilen lived with Rush for a short period of time but left him after he became abusive. She then began living with Lisa in Council Bluffs, Iowa.

A few months later, Feilen met Shekie through a "dating app." At some point, Shekie arranged to pick up Feilen from her friend's house in Omaha. They traveled together to Shekie's trailer in Lincoln, where Feilen stayed for approximately 2½ weeks. During this time, they engaged in sex and smoked marijuana. At one point, Feilen and Shekie discussed filming their sexual interactions, but Feilen expressed she was not interested.

Shekie obtained a large quantity of marijuana while Feilen was staying in his trailer. According to Feilen, Shekie asked her to help him sell the drugs. Feilen agreed and posted photographs of the drugs on Snapchat. She also shared these photographs with Marques.

Feilen left Shekie after she learned Shekie was secretly recording their sexual interactions. Feilen and other witnesses testified throughout the trial regarding Shekie's poor character. Several witnesses testified that Shekie used and sold marijuana. Further testimony established Shekie would record his sexual interactions with women and engage in unprotected sex despite having genital warts. Shekie also attempted to sell pornographic videos on the internet.

Feilen moved into Lisa's apartment in Lincoln. Feilen testified that on the morning of the robbery, Marques and Rush called her while she was sleeping at Lisa's apartment. They indicated they wanted to steal Shekie's marijuana. Shortly thereafter, Marques and Rush arrived at Lisa's apartment to try persuading Feilen to join in the robbery. Feilen initially resisted but later agreed to join them after Rush threatened her with a gun.

Feilen, Marques, and Rush left Lisa's apartment and drove to Shekie's trailer home. Rush was driving. Other evidence adduced at trial established that the vehicle Rush was driving, a van, belonged to Marques' girlfriend. Feilen observed a gun on the "floor of the driver's seat."

According to Feilen, they arrived around 3 a.m. and, after about 10 minutes, Rush got out of the van with the gun. He proceeded to Shekie's trailer and kicked in the door. Feilen heard two or three gunshots and then heard Shekie scream. Marques moved to the driver's seat, and he and Feilen drove away. Feilen observed Rush exit the trailer and run.

A few minutes later, Rush contacted Feilen and Marques and they picked him up at a nearby building. Rush told Feilen and Marques that Shekie was "squirming" and so he fired shots in the air. He never made any statements about shooting Shekie during the robbery. The group initially drove back to Lisa's apartment but could not get in. They ended up driving to Omaha to drop off Rush between 4 and 5 a.m.

Feilen testified that sometime the next day, Rush told her "to stay low and to not say anything." He also told her via "Facebook Messenger" to keep quiet and delete their prior conversations. He asked Feilen whether Shekie had any cameras in his trailer.

During cross-examination, defense counsel impeached Feilen numerous times with prior statements she made to law enforcement during the investigation. Feilen previously told law enforcement that she "never stayed with . . . Shekie," but admitted at trial that was not true. Feilen told investigators

she had "never exchanged sex for money," but admitted at trial that was untrue. Feilen stated to law enforcement that she had "never had sex with . . . Shekie," but then testified at trial that she lied and had previously had sex with Shekie "five or six times." When asked during the investigation when she had last seen Shekie, Feilen told officers she had not contacted him since Valentine's Day 2021, but she admitted at trial that was not true; she admitted she had contacted him the day before his murder. Feilen also admitted at trial that she lied when she told law enforcement that she did not have "anything to do with . . . Shekie's death." She told law enforcement she was sleeping at Lisa's house the night of the murder, but admitted at trial that that was a lie and that she was "in the van."

Feilen told law enforcement in her proffer interview that it "made [her] mad" when she heard Shekie was having sex with other women. She testified at trial, however, that she exaggerated her anger and did not fully tell the truth in her proffer interview. Feilen also told law enforcement that she was "okay" with Shekie's recording their sexual interactions but admitted at trial that was not true. Feilen admitted she had lied to law enforcement by stating that Shekie was angry she was leaving him. Feilen admitted Shekie was unaware of her plan to leave him. When asked by defense counsel whether she was aware Rush impregnated other women while she was living with him, Feilen responded, "I did not know that." But defense counsel adduced evidence that Feilen had previously told law enforcement that Rush had impregnated other women while she lived with him. Feilen also testified that she was not living with Lisa on the Valentine's Day before Shekie's death. She admitted she lied during the investigation by telling law enforcement she was living with Lisa at that time.

Feilen admitted during cross-examination that she told an officer during an interview, "I lie, I do it all the time." Finally, defense counsel adduced Feilen's testimony that around the time of Shekie's death, she "lie[d] all the time."

(b) Testimony of Marques

Marques also testified at trial under a cooperation agreement with the State.

Around the time of Shekie's death, Marques was living in Council Bluffs with his girlfriend. He had been previously shot in a robbery in 2014. As a result, he was paralyzed from the waist down and cannot walk without therapy and custom-made braces. Marques testified that he had not used his braces since 2019 and that he was using a wheelchair around the time of Shekie's death.

Marques testified that he met Rush for the first time in January 2021, when Rush wanted to purchase drugs from him. Thereafter, Rush would communicate with Marques through Facebook on a friendly level.

On February 19, 2021, Feilen sent Marques photographs and videos of large quantities of drugs located at Shekie's trailer. Hours before the robbery, Marques messaged Feilen in response, asking if they were going to take the drugs from the trailer. According to Marques, Feilen knew where the drugs were in the trailer and was going to take them when Shekie was not home. Around 2 a.m., Marques sent another message to Feilen, asking where the drugs were.

Marques testified that later that morning, he drove with Rush to Lisa's apartment in Lincoln with the intent to take the drugs from Shekie's trailer. During the drive, Marques observed a firearm in the van. After arriving at Lisa's apartment, the group planned the robbery.

Just after 3 a.m., Feilen, Marques, and Rush left Lisa's apartment and went in the van to Shekie's trailer home, using "GPS" for directions. Rush was driving. A few minutes after arriving, Rush pulled out a black gun, put on his gloves, and started walking toward the trailer.

Marques apparently told Feilen to get in the driver's seat and pull up to the curb. Marques testified that after a few seconds, he heard two or three gunshots and a loud scream

from inside Shekie's trailer. Marques told Feilen to drive away because they "didn't come [there] for that."

Feilen and Marques drove away, leaving Rush behind. Rush called Marques and told him to pick him up at a nearby building. Feilen and Marques located Rush and drove toward Lisa's apartment. When they could not gain access to the apartment, the group eventually drove to Omaha to drop off Rush at his home. Feilen and Marques then drove to Marques' home in Council Bluffs.

On cross-examination, defense counsel inquired about a conversation between Marques and Emmanuel Winns, one of Marques' friends, that occurred shortly before Shekie's death. Marques testified that the day before the robbery, he sent a message to Winns that stated, "[B]ro, me and my lil sis got a couple stains on deck." Winns replied, "U know I'm down." Marques then asked Winns whether he had any guns, and Winns responded, "They around." Marques sent another message to Winns that stated, "Bro im talmout 1k @some hotel & if you got [gas money] its 4 lbs in Lincoln we can go get tonight. Both these stains."

Marques indicated that the 4 pounds of drugs discussed in the messages with Winns were unrelated to Shekie's drugs and that the similarities between the planned robberies were "just a coincidence." Marques further stated that the "lil sis" referred to in the message was a friend and not a reference to Feilen. Marques testified that investigators never spoke with him about Winns until shortly before the trial began.

### (c) Photograph of Marques' Pressure Sore

Since his paralysis, Marques has suffered a severe pressure sore. The State offered a photograph of Marques' pressure sore for the purpose of showing that Marques was not physically capable of walking or of robbing Shekie. Rush objected to the photograph based on foundation, relevance, confusion of the issues, and its prejudicial effect. The district court overruled the motion and received the photograph into evidence.

(d) Messages With Heather Brand
and Shekie's Photograph

The State called Heather Brand, who testified she was in a relationship with Shekie around the time of his death. Brand was called to testify regarding her communications with Shekie to prove the date that Rush committed the offenses. Brand testified that she communicated almost every day with Shekie through telephone calls, text messages, and video calls. To establish the time of Shekie's death, the State offered text messages between Shekie and Brand to show Brand's regular communication with Shekie, which then ceased. Rush objected to these messages based on relevance. The court overruled the objection but instructed the jury to ignore the content of the messages and consider only their dates and time stamps.

According to the text messages, Shekie regularly communicated with Brand from January 7, 2021, until their last text communication on February 22. Brand testified that on February 22, Shekie told her during a call that "something's not right." After hanging up, Brand received a final text communication from Shekie on February 22 at 7:55 p.m.

(e) Photograph of Shekie

Brand and several other witnesses identified Shekie at trial using a photograph introduced by the State depicting Shekie wearing a hardhat and smiling in the direction of the camera. Some of these witnesses did not know Shekie by name. One of Shekie's neighbors testified he had observed the door of Shekie's trailer open for several days. When shown a photograph of Shekie, the neighbor stated, "That could be him." Although the prosecutor did not ask the neighbor about Shekie's character, the neighbor continued, "He was that kind of person." Another neighbor testified that she called the police after also observing the trailer door open. She acknowledged she did not know Shekie by name. When shown the photograph of Shekie, she testified, "Yes, that does look like

him." At no point during the trial did Rush object to the admissibility of this photograph, even when it was presented to witnesses who knew Shekie by name or had a prior relationship with him.

### (f) Identification of Rush in Surveillance Video

The State offered several clips of motion-activated surveillance footage depicting the inside corridor and outside parking lot of Lisa's apartment building on February 23, 2021, between 3 a.m. and 7 a.m., which was near the time of Shekie's death.

At approximately 2:17 a.m., the outdoor footage shows an individual wearing a "dark hoodie" pulling Marques in a wheelchair away from a van and toward the front door of the apartment building. The motion-activated cameras did not capture Marques and the other individual exiting the van.

At 2:59 a.m., the indoor footage shows Feilen, wearing a red hat, walking down the stairs from Lisa's apartment with Marques and the dark-hooded individual. Subsequently, the outdoor footage shows Feilen entering the back seat of the van, Marques entering the front passenger seat, and the dark-hooded individual entering the driver's seat. At 3:02 a.m., the van leaves the parking lot.

The next clip shows the van driving back into the parking lot at Lisa's apartment building shortly before 5 a.m. During the investigation, law enforcement believed Shekie's death occurred between the time the van left Lisa's apartment and when it returned. Marques confirmed in his testimony that the robbery occurred before the van returned to Lisa's apartment shortly before 5 a.m. on February 23, 2021.

According to one investigator's testimony, the surveillance footage does not provide a clear picture of the dark-hooded individual's face and does not allow identification of the individual. However, Chris Fields, an investigator with the Lincoln Police Department, testified he could identify Rush as

the dark-hooded individual in the surveillance footage. While Fields acknowledged his total time with Rush was "[n]ot long," he explained that he was familiar with Rush's appearance because he was the lead investigator into Shekie's death and traveled to Chicago to contact Rush, who had been taken into police custody. While in Chicago, Fields was present during an interview with Rush. He also obtained a buccal swab from Rush after he was brought back to Lincoln. Fields testified he spent "hours . . . watching that video and dealing with . . . Rush."

Rush did not object to this identification at trial; nor did he attempt to cross-examine Fields after this testimony.

Later in the trial, Feilen also identified Rush as the person in the surveillance footage in the dark hoodie, stating she saw him at Lisa's apartment that morning. Marques also testified that the person in the surveillance footage was Rush. Rush did not object to these statements.

(g) Cell Phone Evidence

The State offered at trial evidence obtained from Rush's cell phone during the investigation. This evidence included Facebook messages from Rush's cell phone sent near the time of Shekie's death. In one Facebook message sent on February 23, 2021, at 11:51 p.m., Rush told a friend, "I need to get away ASAP." In another message, sent on February 24, Rush said, "I need to get out and stay low Ass." On March 5, Rush sent a Facebook message to his mother that said, "I'm sorry mom I love you and I disrespected the family I fucked up I'll be by to see you but it's deep and excuse my language."

The State's evidence also included Facebook messages between Rush and Feilen after Shekie's death. On March 4, 2021, Rush sent a message to Feilen that said, "Aye man I'm gone plane to hot, train to hot, bus to hot but I'm gone hitting back to Vegas." Two days later, after Feilen provided statements to law enforcement, Rush sent her another message, which said, "Rat pack." Rush had also sent a message

on March 5 to Marques that said, "Y'all rats?" On March 8, Rush sent a message to another acquaintance that said, "I need a[n] Escape plan."

Cell tower data showed that Rush's cell phone was in the area of Shekie's residence at the time of the robbery. His cell phone records showed that Rush made several internet searches after Shekie's death regarding warrants, penalties for first degree murder in Nebraska, and how to sneak into Canada and Mexico. He also asked a friend how to obtain a fake identification document and indicated that he intended to leave town.

Defense counsel did not object at trial to the admission of this evidence. Nor did defense counsel object to the subpoenaed cell phone records and the more detailed records obtained through a search warrant, when the State offered them as evidence.

The State also offered text messages from Rush's cell phone that were the subject of the rule 404 hearing. Defense counsel objected to the admission of these messages "under Rule 404(2)." The court overruled the objection and instructed the jury the messages were to be considered "for the purpose of showing motive and for no other purpose." According to trial testimony, the messages were consistent with language used in drug transactions.

### (h) Other Evidence

Evidence was received demonstrating that during a search of Shekie's trailer and the surrounding area, law enforcement officers located several .45-caliber shell casings and bullets.

Law enforcement also observed a shoeprint on a door of the trailer. Using photographs of Rush's shoes from social media, forensic analysis confirmed that the tread of Rush's shoes in those photographs shared a similar pattern with the shoeprint on Shekie's door. The forensic analyst testified that the shoeprint was associated with "numerous models of Jordan by Nike footwear." The photographs of Rush from

social media were entered into evidence. Those photographs depict Rush wearing "Jordan by Nike" shoes that are primarily black. There was testimony suggesting that the shoes Rush was wearing in these photographs had characteristics similar to those of the shoes he appeared to be wearing in the surveillance footage from Lisa's apartment.

The State introduced at trial screenshots from Feilen's controlled conversation with Rush after Shekie's death, showing Rush asking Feilen via Facebook Messenger to "delete [her] side of the conversation" and "keep shut" and stating he had his alibi "covered."

The State also offered surveillance footage depicting the area near Shekie's trailer between 3 and 5 a.m. on February 23, 2021, which law enforcement believed was the period during which the homicide occurred. According to law enforcement testimony, the footage depicts an individual running southbound on North 20th Street near Shekie's trailer around the time of the robbery. Law enforcement believed Rush was the individual seen running in the footage, which was consistent with the information provided by Feilen and Marques.

(i) Testimony of Rush

Rush testified at trial in his own defense. Rush described that in February 2021, he lived on Mary Street in Omaha with his nephew and a high school friend.

Rush testified that he met Feilen through Facebook and began having a sexual relationship with her in October 2020. According to Rush, Feilen stayed at his home for about 3 weeks because she refused to leave. Feilen eventually left after getting into a fight with one of Rush's friends.

Rush testified that he was at his house in Omaha with his girlfriend, Aniya Young, when the robbery occurred. Rush stated that early that morning, Young began to attack him after she found videos on his phone of "flings" with other women. In response, Rush stated he "hemmed [Young] up" and restrained her arms. Young left between 4 and 6 a.m. The next

day, Young apparently reported Rush to the police and Rush began searching for warrants related to the altercation.

Rush testified that days before the robbery, he had accidentally left his cell phone in Marques' vehicle. On February 24, 2021, Rush's dogs located his cell phone in the front yard of his residence. Rush appeared to testify on cross-examination that Marques left the cell phone out by the street and that he was angry with Marques for doing so.

Rush testified that he and Young reconciled and that they fled on March 5, 2021, to Chicago after learning he was wanted for the altercation with Young and as a suspect in Shekie's murder. Rush confirmed that he was involved in four high-speed chases with the police in Illinois. Rush testified that he did not turn himself in and try and speak with law enforcement because "young black men [were] getting shot left and right." Eventually, law enforcement located and arrested Rush in Chicago.

During cross-examination, Rush denied sending certain messages in his Facebook Messenger account, claiming his account was hacked. When asked why he failed to notify law enforcement of this, he responded, "It's not my job to let people know that they fucked up."

Rush was confronted with a prior statement to law enforcement that declared, "I don't own no black Jordan shoes." Rush testified he sold the shoes to someone in Las Vegas.

The prosecution questioned Rush's timeline of the assault based on a conversation he had on February 24, 2021, with Lonna Lane, Young's older sister. Rush sent a message to Lane via Facebook Messenger on February 24 at 5:52 a.m. that stated, "Come get this lying cheating ass bitch off my shit." Minutes later, Rush messaged Lane, "She gone and she probably gone throw me in jail hood." Lane replied, "Boy get my sister out that fucking cold and take her home you should've never went and picked her up if you was gone be putting her out and putting yo hands on her." Rush stated he sent this message "when [Young] came back" after leaving. In other

words, Rush appeared to testify that Young left his residence after the initial domestic assault on February 23, returned to Rush's residence, and then left again on February 24.

While testifying, Rush at times appeared combative and callous. During cross-examination, Rush tried to question the prosecution from the witness stand. Rush interjected, "But did y'all—I got a question, sir. How well did y'all do—," at which point the prosecution responded, "No. Sir, you don't get to do that." Also, Rush indicated that he was not concerned about the safety of others during high-speed chases with law enforcement, because he "know[s] how to drive."

### (j) Subpoena for Absent Witness and Warrant for Domestic Assault

Defense counsel expressed concerns in a sidebar conference during Rush's testimony regarding an absent witness he wished to call to testify, Officer James Bruning. In April 2022, Rush filed a notice of alibi revolving around the domestic assault altercation with Young that allegedly occurred around the time of the murder and robbery of Shekie and resulted in a warrant for Rush's arrest. During the sidebar conference, defense counsel stated that he had attempted to subpoena Bruning, the officer who had obtained the warrant related to this altercation, to testify at trial.

Although defense counsel had filed a praecipe for the subpoena of Bruning 2 or 3 days prior, he did not receive an email from the clerk of the Lancaster County District Court with the subpoena for him to forward to Douglas County to have it served. Defense counsel discovered this was because the clerk had inadvertently sent the subpoena to the prosecution. Defense counsel discussed the matter with the clerk, who discussed the matter with Douglas County and determined the best course of action was to email the subpoena directly to Bruning. The clerk apparently sent the subpoena to Bruning, but Bruning never responded.

The prosecutor explained during the sidebar conference that the prosecution had also sent a subpoena to Bruning.

However, the prosecution ultimately decided not to call him as a witness. When the prosecutor told Bruning the State would not be calling him as a witness, he informed Bruning that if the defense served him with a subpoena, "he would need to honor that." The prosecutor explained that he was never aware of whether the defense had actually served Bruning with a subpoena. The prosecution later realized it had emailed Bruning two subpoenas by mistake, not knowing one of them was for the defense.

The transcript contains a praecipe dated July 18, 2022, by defense counsel for a subpoena to be served on Bruning. A copy of the corresponding subpoena to testify as a witness for the defense, dated July 18, 2022, is also in the transcript. The transcript contains another praecipe to subpoena Bruning, dated October 21, 2022, by defense counsel. The transcript contains a subpoena dated October 21, 2022, with record of service on October 28 for Bruning to testify as a witness, but it stated this was "on behalf of [the] State of Nebraska." The transcript contains a copy of the State's praecipe for subpoena of Bruning dated September 29, 2022. It contains a corresponding subpoena dated September 30, 2022, to appear to testify for the State. A process service return, stating Bruning was not served because no address was provided, is dated October 3, 2022; however, another filing indicates the State's subpoena was eventually served on October 12. Finally, the transcript contains a praecipe, dated December 15, 2022, by defense counsel for a subpoena to be served on Bruning, and it contains a copy of another subpoena dated December 15, 2022.

Defense counsel neither sought a continuance of the trial to secure Bruning's attendance nor asked for a mistrial based on the clerk's error. Rather than pursuing Bruning's attendance, defense counsel asked if the prosecution would agree that "the arrest warrant could just come in." Defense counsel conceded that the arrest warrant reflected only the date Bruning responded to the report of the offense and not necessarily

the date the offense occurred. Defense counsel also said he was "not offering this as an alibi," since he was no longer pursuing an alibi defense. He wished only to corroborate Rush's testimony that part of the reason he fled to Chicago was because there was an arrest warrant for him on the domestic assault charge. Defense counsel conceded Rush also fled because he learned he was a suspect in the murder, but counsel said he wanted to admit evidence of the domestic assault to corroborate Rush's testimony and avoid a situation where the prosecution could undermine Rush's credibility by arguing to the jury that there was no evidence to support Rush's claim that he committed a domestic assault the day of the robbery and murder.

Defense counsel warned that if he were not permitted to admit the arrest warrant into evidence without Bruning's testimony, "then [he was] going to insist, or . . . going to request, [a] delay . . . until [he could] get that cop here so he—he can testify." And he did not "know how easy [that was] going to be." The prosecution was not amenable to defense counsel's suggestion that, to avoid a delay, it stipulate to the timeframe of the assault. The prosecution believed the assault was "made up" to give Rush an alibi. The prosecutor said he would object to the warrant as hearsay if it were offered. Rush never offered the warrant as evidence at trial.

### 7. Prosecution's Closing Arguments and Motion for Mistrial

Before closing arguments, defense counsel expressed concern that it would be misconduct if the State indicated to the jury that there is no evidence of an arrest warrant to support Rush's testimony. In response, the prosecution stated that "I'm not going to talk too much about the warrant" and that "[Rush] claims that there was a warrant issued, and that's why he was running, but there's nothing to corroborate, you know, when, where, and how that happened that led to whatever warrant was issued." Defense counsel responded, "All right, be careful because there was a warrant. There is a warrant."

In closing arguments, the prosecutor told the jury, with respect to the domestic assault: "[T]here is absolutely no corroboration to show when, what, where, or how that warrant came about. [Rush] said there was a warrant for his arrest. There's nothing to support how that all came about." The prosecutor did not contest that a domestic assault occurred or that a warrant was issued in relation to the domestic assault, but proposed that the assault did not occur at the same time as the murder, again stating, "there's absolutely nothing that corroborates when, where, and how that happened." The prosecutor's closing arguments are set forth in more detail in the analysis.

Defense counsel moved for a mistrial on the ground that the State knowingly made a false statement by telling the jury there is nothing to corroborate Rush's testimony regarding the domestic assault warrant. The court overruled the motion.

## 8. Motion for New Trial

After the verdicts were entered, defense counsel moved for a new trial based on the errors relating to the failure to subpoena Bruning and on alleged prosecutorial misconduct during closing arguments. A hearing on the motion for new trial was held on December 29, 2022.

At the hearing, defense counsel said that he had subpoenaed Bruning to testify at the trial and that Bruning "didn't show up." Defense counsel then clarified that his subpoena had been emailed to the prosecution and sent with the State's subpoena to Bruning and that the State then told Bruning the prosecution would not be calling him. Defense counsel initially told the court he was unsure if there was ever a second subpoena. However, defense counsel then said that another subpoena was issued and that the clerk "tried to serve him with that and it seemed he managed to avoid service."

In response to the court's questioning, defense counsel conceded that he knew at trial that Bruning was not going to appear. Defense counsel conceded that despite knowing this,

he did not request a continuance of the trial to have Bruning subpoenaed and brought in by warrant if necessary.

For the purpose of the motion, the court allowed into evidence an affidavit by defense counsel averring that on October 21, 2022, he filed a subpoena duces tecum for Bruning to appear at trial on November 9. He learned during trial that the clerk of the district court's office emailed the subpoena to the prosecution rather than to the defense and that the prosecution "forwarded the subpoena to someone in Omaha/Douglas County because Officer Bruning was served with the subpoena on October 28, 2021." Defense counsel averred that the prosecutor had told him he had spoken to Bruning and had told Bruning he did not need to honor the prosecution's subpoena but that he would have to honor any other subpoena.

During the hearing on the motion for new trial, defense counsel explained that Bruning was, in the end, successfully subpoenaed to appear at the hearing but had not appeared. Defense counsel wanted Bruning to testify as to why he had not appeared at trial. Defense counsel asked that the court continue the hearing on the motion for new trial until Bruning's attendance could be secured.

The trial court granted a continuance, apparently in part because it wished to have a transcription of the closing arguments, which was not yet available. The hearing on the motion for new trial was continued to a later date to correspond to the sentencing hearing. Defense counsel said he had a witness from the clerk of the district court's office who was prepared to testify at the hearing. However, apparently because of the continuance, that witness was not called.

On the date scheduled for the continued hearing on the defense's motion for new trial, defense counsel announced he was withdrawing the motion.

## 9. Theory of Defense

Defense counsel's theory of defense was that "Feilen hated . . . Shekie so much she wanted him dead" and that she also

hated Rush, so she conspired with Marques and Winns to commit the murder and robbery of Shekie and falsely implicate Rush in the crimes. Defense counsel argued that the jury cannot find Rush guilty beyond a reasonable doubt, because to do so, the jury must believe the testimony of Feilen and Marques, both of whom "lie all the time." Defense counsel also argued that on the night of the murder, Rush was in Omaha with Young when an argument escalated into domestic violence. While defense counsel acknowledged that Rush's fleeing to Chicago could indicate a consciousness of guilt, he claimed Rush's behavior was also "consistent with somebody who's innocent, who's been falsely accused, at least of murder."

## 10. Verdicts and Sentencing

The jury returned verdicts finding Rush guilty of murder in the first degree and use of a firearm to commit a felony. The district court accepted the jury's verdicts and ordered a presentence investigation.

The district court sentenced Rush to life imprisonment for the murder conviction and 25 to 35 years' imprisonment on the weapon conviction, to be served consecutively. Rush appeals. Rush has new counsel on appeal.

## III. ASSIGNMENTS OF ERROR

Rush assigns, consolidated, reordered, and restated, that (1) the trial court erred by overruling defense counsel's hearsay objection to evidence introduced at his rule 404 hearing; (2) the trial court erred in admitting, over defense counsel's objections, Shekie's text messages to Brand; (3) the trial court erred in admitting, over defense counsel's objections, a photograph of Marques' pressure sore; (4) trial counsel was ineffective for failing to object to, and the district court erred or committed plain error in denying defense counsel's motion to suppress, his cell phone records that were allegedly obtained through a warrant tainted by an unlawful subpoena; (5) trial counsel was ineffective for failing to object to, and the district

court erred or committed plain error in allowing, Fields' identification of Rush in the surveillance video; (6) trial counsel was ineffective for failing to object to, and the district court erred or committed plain error in admitting, an allegedly irrelevant photograph of Shekie; (7) trial counsel was ineffective by failing to adequately impeach Feilen; (8) trial counsel was ineffective by inadequately preparing Rush to testify; (9) the district court clerk committed plain error by failing to properly issue defense counsel's subpoena of Bruning; (10) the prosecution committed misconduct by interfering with the subpoena of Bruning; (11) trial counsel was ineffective by withdrawing the motion for new trial based on the failure to properly subpoena Bruning; (12) trial counsel was ineffective by failing to properly pursue an alibi defense; (13) the district court committed plain error by denying Rush's motion for mistrial after the prosecution committed misconduct during closing arguments by knowingly making false statements; (14) trial counsel was ineffective for withdrawing Rush's motion for new trial based on prosecutorial misconduct during closing arguments; (15) the evidence adduced at trial was insufficient to sustain a finding that Rush used a firearm in the commission of a felony; and (16) trial counsel was ineffective by stipulating to the State's motion for mistrial due to delays caused by COVID-19.

## IV. STANDARD OF REVIEW

[1] The meaning and interpretation of statutes and regulations are questions of law for which an appellate court resolves independently of the lower court's conclusion.[1]

[2] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[2]

---

[1] *State v. Earnest*, 315 Neb. 527, 997 N.W.2d 589 (2023).

[2] *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020).

[3] Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court, whose decision we will not reverse unless there is an abuse of discretion.[3]

[4] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[4] Regarding historical facts, an appellate court reviews the trial court's findings for clear error.[5] Whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[6] And where the facts are largely undisputed, the ultimate question is an issue of law.[7]

[5] Consideration of plain error occurs at the discretion of an appellate court.[8]

[6] The decision whether to grant a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion.[9]

## V. ANALYSIS

### 1. Hearsay at Rule 404 Hearing

We first address Rush's assignment that the court erred during the rule 404 hearing by overruling his hearsay objection to text messages and police reports evidencing he was dealing marijuana at the time of the murder and robbery. Without such alleged hearsay evidence, argues Rush, the State was unable, as required by § 27-404(3), to prove by clear and

---

[3] See *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

[4] *State v. Simons*, 315 Neb. 415, 996 N.W.2d 607 (2023).

[5] *Id*.

[6] *Id*.

[7] See *id*.

[8] *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023).

[9] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

convincing evidence that he committed the crime, wrong, or act of dealing marijuana. Rush conceded that motive was a proper purpose for use of the evidence. The trial court overruled Rush's hearsay objection on the ground that the rules of evidence do not apply to rule 404 hearings and overruled his renewed objection to the evidence at trial. Evidence that Rush was dealing marijuana was admitted at trial as relevant to Rush's motive for the murder and robbery. Rush does not argue that the State relied at trial on hearsay to establish that he was dealing marijuana. We agree with the trial court that the rules of evidence do not apply to rule 404 hearings.

[7] We have generally held that the rules of evidence do not operate with full force at hearings before a judge to determine a preliminary question of the admissibility of evidence.[10] The trial judge's experience and legal training can instead be relied on to inform crucial distinctions and to reveal the inherent weakness of evidence by affidavit or hearsay.[11]

Section 27-1101(2) states that the Nebraska rules of evidence "apply generally to all civil and criminal proceedings." However, § 27-1101(4)(b) exempts from the evidence rules "*preliminary* examinations or *hearings* in criminal cases." (Emphasis supplied.)

[8] Our rules of evidence do not specify what types of hearings qualify as preliminary hearings,[12] but we explained in *State v. Piper*[13] that there is no statutory indication the reference to preliminary hearings in § 27-1101(4)(b) was meant to carry a special or limited meaning. Thus, we look to its ordinary meaning.[14] Something that is "preliminary" is

---

[10] See *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

[11] See *id*.

[12] See *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014).

[13] *Id*.

[14] *Id*.

"'something that precedes a main discourse, work, design, or business' or 'something introductory or preparatory.'"[15]

Applying this definition, we held in *Piper* that a suppression hearing is a preliminary hearing for purposes of § 27-1101(4)(b). We first observed that under the statute[16] governing motions to suppress, it is clearly the intention that, with certain exceptions contained in the statute, the motion to suppress be ruled on and finally determined before trial.[17] Thus, the suppression hearing precedes the main discourse of a criminal case in the sense that a motion to suppress is decided before the trial.[18]

Secondly, a defendant must make a specific objection at trial to the offer of evidence that was the subject of an unsuccessful motion to suppress, in order to preserve an alleged error in its admission.[19] This, we explained, indicates a suppression hearing is preparatory and precedes the main discourse of the trial.[20] Finally, we said that a suppression hearing "relates to auxiliary issues not immediately relevant to the question of guilt and is held in anticipation of certain evidence being introduced at a forthcoming trial."[21]

[9] Section 27-404(1) operates as a broad exclusionary rule of relevant evidence that speaks to a criminal defendant's propensity to have committed the crime or crimes charged; meanwhile, § 27-404(2) operates as an inclusionary rule of evidence that provides that evidence that raises a propensity inference is admissible for other proper purposes, including

---

[15] *Id.* at 374, 855 N.W.2d at 9, quoting Webster's Third New International Dictionary of the English Language, Unabridged (1993).

[16] Neb. Rev. Stat. § 29-822 (Reissue 2016).

[17] *State v. Piper, supra* note 12.

[18] *Id*.

[19] *Id*.

[20] *Id*.

[21] *Id.* at 374, 855 N.W.2d at 9 (internal quotation marks omitted).

proof of motive, intent, preparation, or absence of mistake or accident.[22]

Under § 27-404(3), a proponent of evidence offered pursuant to § 27-404(2), upon objection to its admissibility, is required to state on the record the specific purpose or purposes for which the evidence is being offered, and the trial court must similarly state, on the record, the purpose or purposes for which such evidence is received.[23] Pursuant to § 27-404(3), before the admission of such evidence, the prosecution must prove to the court, outside the presence of the jury, "by clear and convincing evidence that the accused committed the crime, wrong, or act."[24]

[10,11] Similarly to the intent expressed in the statute governing a hearing on a motion to suppress, it was the manifest intention of the Legislature in § 27-404 that the question of whether a prior bad act is admissible at trial as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident be ruled on and finally determined before the jury learns of such evidence. Thus, the rule 404 hearing precedes the main discourse of a criminal case.

[12] Like the subject of a suppression hearing, the defendant must make an objection at trial to the offer of evidence of other crimes, wrongs, or acts, which was the subject of a rule 404 hearing, in order to preserve an alleged error in its admission during the trial.[25] Finally, a rule 404 hearing relates to evidence supporting the inference of guilt when viewed in conjunction with other evidence admitted at trial; thus, it relates to auxiliary issues not immediately relevant to the

---

[22] *State v. Esch*, 315 Neb. 482, 997 N.W.2d 569 (2023).

[23] *Id*.

[24] *Id*. at 503, 997 N.W.2d at 586 (internal quotation marks omitted).

[25] See, e.g., *State v. Wheeler*, 314 Neb. 282, 989 N.W.2d 728 (2023); *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014); *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

question of guilt and held in anticipation of certain evidence to be introduced at a forthcoming trial.

[13] We have previously described the court's determination regarding the admissibility of evidence at a rule 404 hearing as a "preliminary determination."[26] We now expressly hold that a hearing conducted under § 27-404 is a preliminary hearing for purposes of § 27-1101(4)(b), exempting it from the evidence rules.

We have not previously had occasion to address the correctness of *State v. Wilson*,[27] an opinion by the Nebraska Court of Appeals decided in 1996, holding that the rules of evidence apply to rule 404 hearings. We now expressly disapprove of that decision to the extent it holds that a rule 404 hearing is not a preliminary hearing. We observe that while the Court of Appeals rejected the idea that the rules of evidence are inapplicable at "*any* hearing in a criminal case,"[28] it did not articulate why a 404 hearing is not a *preliminary* hearing under § 27-1101(4)(b). Also, at the time of the Court of Appeals' decision, we had not yet decided *Piper*.[29] Thus, the Court of Appeals did not have available to it our reasoning as set forth therein.

[14] Assuming without deciding that the evidence at the rule 404 hearing of Rush's drug dealing was in fact hearsay, the trial court did not err in overruling Rush's hearsay objection. In a hearing conducted pursuant to § 27-404, the trial judge's experience and legal training can be relied on to inform crucial distinctions and to reveal the inherent weakness of evidence by hearsay. The State proved by clear and convincing evidence that Rush was involved in selling marijuana at the time of the murder and robbery of Shekie. The district court did not err in admitting the evidence of those prior bad acts at trial.

---

[26] *State v. Esch, supra* note 22, 315 Neb. at 503, 997 N.W.2d at 586.

[27] *State v. Wilson*, 5 Neb. App. 125, 556 N.W.2d 643 (1996).

[28] *Id.* at 127, 556 N.W.2d at 652.

[29] *State v. Piper, supra* note 12.

## 2. Admission of Evidence at
## Trial Over Objection

We next address Rush's assignments that the court erred in admitting at trial, over Rush's objections, the evidence of Shekie's text messages and Marques' pressure sore.

### (a) Shekie's Text Messages to Brand

Rush argues the court erred in overruling his objection to the admission of text messages from Shekie to Brand, which showed regular contact with Brand until the day before Shekie was murdered. The State offered the text messages to establish the time of the murder, and Rush objected only on the ground of relevance. Even though Rush did not object on the ground of unfair prejudice, the court instructed the jury to consider the date and time stamps of the messages and not their content.

[15,16] Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[30] The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.[31] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[32]

[17] While Rush complains that the content of the messages illustrates Shekie treated Brand with genuine affection, this point pertains to unfair prejudice, and Rush does not assign as error that trial counsel was ineffective for failing to object on that basis. Rush's only argument pertaining to relevance is that the time of death was established by other evidence and that therefore, the messages were cumulative. However,

---

[30] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

[31] *Id.*

[32] *State v. Jennings, supra* note 2.

evidence is not irrelevant simply because there is other evidence admitted at trial supporting a similar inference. The trial court did not abuse its discretion in determining that the messages were relevant.

### (b) Marques' Pressure Sore

Rush argues the court erred in admitting a photograph of Marques' pressure sore, because it was shocking and presented the danger of evoking sympathy for Marques. As relevant to this assignment of error, Rush objected on the grounds of unfair prejudice and confusion of the issues. The State offered the photograph to support the inference that Marques was unable to walk and, thus, was not the shooter.

[18,19] Rush argues on appeal that any relevance of the photograph to show that Marques could not walk was minor in comparison, because Marques' inability to walk was established by other evidence and Rush no longer asserted, as part of his theory of defense, that Marques was the shooter. But the State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[33] While Rush points out that he offered to stipulate that Marques was paralyzed, a defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.[34]

[20,21] Under Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[35] Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party.[36] *Unfair* prejudice means an undue tendency to suggest a decision based on an improper basis.[37]

---

[33] *State v. Britt*, 305 Neb. 363, 940 N.W.2d 270 (2020).

[34] *State v. Abdulkadir*, 286 Neb. 417, 837 N.W.2d 510 (2013).

[35] *State v. Chauncey*, 295 Neb. 453, 890 N.W.2d 453 (2017).

[36] *State v. Oldson, supra* note 30.

[37] *Id*.

[22,23] Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.[38] When considering whether evidence of other acts is unfairly prejudicial, we consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.[39] Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court, whose decision we will not reverse unless there is an abuse of discretion.[40]

The photograph of Marques' pressure sore might have evoked an emotional response of sympathy in the jurors, but it is unlikely that response would have lured the jury into declaring Rush guilty for an incorrect reason. As the trial court pointed out, the jury was already aware through other evidence that Marques was paralyzed in some capacity and used a wheelchair. Furthermore, the instructions directed the jury not to "indulge in any speculation, guess or conjecture" and not to allow "sympathy or prejudice" to impact the verdict. We cannot say on appeal that the trial court abused its discretion in determining that the probative value of the photograph outweighed any danger to Rush of unfair prejudice.

### 3. Evidence Not Objected to

We next address Rush's assignments of error relating to the admission of evidence not objected to at trial: (1) a photograph of Shekie smiling, (2) Rush's cell phone location information, and (3) Fields' identification of Rush in the surveillance footage outside of Lisa's apartment. Rush argues that trial counsel was ineffective for failing to object and that the trial court committed plain error in allowing the admission of this evidence.

---

[38] *Id.*

[39] *Id.*

[40] See *State v. Thomas, supra* note 3.

[24,25] Rush also assigns and argues that the trial court committed reversible error in admitting this evidence. However, the failure to object to evidence at trial, even if the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.[41] Failure to make a timely objection waives the right to assert prejudicial error on appeal.[42] Thus, we will address only whether trial counsel was ineffective and whether the court committed plain error in relation to this evidence.

### (a) General Principles of Ineffective Assistance

[26] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[43] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[44]

### (i) Deficient Performance

[27,28] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[45] In determining whether trial counsel's performance was deficient, courts give counsel's acts a strong presumption of reasonableness.[46]

[29,30] An appellate court will not judge an ineffectiveness of counsel claim in hindsight, and it will not second-guess

---

[41] *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021).

[42] *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020).

[43] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[44] *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024).

[45] See *State v. Henderson*, 301 Neb. 633, 920 N.W.2d 246 (2018).

[46] *Id*.

trial counsel's reasonable strategic decisions.[47] We must assess trial counsel's performance from counsel's perspective when counsel provided the assistance.[48] And it is well settled that the decision to object or not to object is part of trial strategy.[49]

### (ii) Prejudice

[31,32] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[50] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[51] When considering the prejudice prong of ineffective assistance of counsel, we focus on whether a trial counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair.[52]

### (iii) On Direct Appeal

[33] It is well settled that when a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.[53] Otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[54]

[34] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it

---

[47] *Id*.

[48] *Id*.

[49] See, *State v. Wickline*, 241 Neb. 488, 488 N.W.2d 581 (1992); *State v. Lieberman*, 222 Neb. 95, 382 N.W.2d 330 (1986).

[50] *State v. Clark, supra* note 44.

[51] *Id*.

[52] See *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[53] *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

[54] *Id*.

can be resolved on direct appeal.[55] In reviewing a claim of ineffective assistance of trial counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows whether counsel did or did not provide effective assistance, and whether the record conclusively shows the defendant was or was not prejudiced by counsel's alleged deficient performance.[56]

[35] When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, it is advisable for appellate counsel to specifically argue prejudice if appellate counsel believes the details in the trial record are sufficient to adequately review the question on direct appeal.[57]

[36] Regardless of whether appellate counsel believes the details in the trial record are sufficient to adequately review the question, an appellant must make specific allegations on direct appeal of the conduct that the appellant claims constitutes deficient performance by trial counsel.[58] In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[59] Mere conclusions of fact or law are not sufficient.[60]

---

[55] See *id*.

[56] See *id*. See, also, e.g., *State v. Miller*, 315 Neb. 951, 2 N.W.3d 345 (2024).

[57] See *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[58] See *id.*

[59] *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019).

[60] *State v. Stelly, supra* note 53.

### (b) Plain Error Principles

[37] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[61] We are not inclined to readily find plain error in testimony to which the opposing party did not object.[62] Even when a question or answer is arguably improper, sua sponte action by the trial court may interfere with a party's trial tactics by bringing unwanted attention to the testimony.[63] "'[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'"[64]

### (c) Cell Phone Location Records

In arguing error in the admission of his cell phone records, Rush focuses solely on his location records and does not specify any other specific cell phone information he believes counsel was ineffective in failing to object to. We have long held that an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[65] Thus, we address only the location records. Although trial counsel moved to suppress his cell phone records, he did not renew the motion at trial.

Rush asserts that the warrant used to obtain the cell site location records was secured through evidence obtained from a subpoena that was unlawful either because no cell phone information can lawfully be obtained through a subpoena or because the subpoena asked for "IP Destination and

---

[61] *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024).

[62] *State v. Mabior, supra* note 8.

[63] *Id.*

[64] *State v. Barfield*, 272 Neb. 502, 511, 723 N.W.2d 303, 312 (2006), *disapproved on other grounds, State v. McCulloch, supra* note 25, quoting *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

[65] *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

Sessions"—albeit "without cell site information." Because of the alleged unlawfulness of the subpoena, Rush asserts the subsequent warrant and the cell site location information obtained therefrom were tainted as the fruit of the poisonous tree.

[38,39] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution prohibit unreasonable searches and seizures.[66] "[A] 'search' under the Fourth Amendment occurs whenever an 'expectation of privacy that society is prepared to consider reasonable is infringed.'"[67]

[40,41] When an individual seeks to preserve something as private, and the individual's expectation of privacy is one that society is prepared to recognize as reasonable, official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.[68] Under the third-party doctrine, depending on the nature of the particular documents sought, a person has no legitimate expectation of privacy in information voluntarily turned over to third parties, even if revealed on the assumption that it will be used only for a limited purpose.[69]

Accordingly, in *State v. Knutson*,[70] we held that the defendant had no reasonable expectation of privacy in cell phone records demonstrating multiple contacts with the victim of child enticement, because this information was voluntarily turned over to the cell phone company as part of the service contract. As such, law enforcement did not violate the Fourth Amendment by obtaining these records by subpoena rather than by warrant.

---

[66] *State v. Simons, supra* note 4.

[67] *State v. Wiedeman*, 286 Neb. 193, 207, 835 N.W.2d 698, 709 (2013), quoting *United States v. Jacobsen*, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).

[68] *Carpenter v. United States*, 585 U.S. 296, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018).

[69] See *id.*

[70] *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

In so holding, we relied on the U.S. Supreme Court case *Smith v. Maryland*,[71] in which the Court held that law enforcement does not need a warrant to obtain a telephone company's record of numbers dialed because it is not a search under the Fourth Amendment. The Court observed that the pen register used to obtain such records did not contain "the *contents* of communications,"[72] and it explained that the defendant had "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business."[73]

In *Carpenter v. United States*,[74] decided in 2018, the U.S. Supreme Court issued what it deemed a "narrow" holding that individuals have a reasonable expectation of privacy in the record of all physical movements captured by cell site location information over an extended period of time.[75] The Court reasoned that "while the third-party doctrine applies to telephone numbers and bank records," "cell-site records" are "qualitatively different."[76] Such location information is "unique"[77] in part because it provides "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years."[78]

Later, in *United States v. Walker*,[79] a federal district court illustrated the narrowness of the Court's holding in *Carpenter.* The district court found that there was no reasonable expectation of privacy for cell phone location information for a

---

[71] *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979).

[72] *Id*., 442 U.S. at 741.

[73] *Id*., 442 U.S. at 744.

[74] *Carpenter v. United States, supra* note 68, 585 U.S. at 316.

[75] See *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019).

[76] *Carpenter v. United States, supra* note 68, 585 U.S. at 309.

[77] *Id.*, 585 U.S. at 315.

[78] *Id*.

[79] *United States v. Walker*, No. 2:18-CR-37-FL-1, 2020 WL 4065980 at *7 (E.D.N.C. July 20, 2020).

particular place at a limited time, obtained through a cell tower "'dump request.'" Similarly, in *United States v. Rhodes*,[80] another lower federal court held there was no reasonable expectation of privacy in the identifying information, telephone numbers calling or called, and information related to those communications, pertaining to all phones within the radius of 12 different towers on 12 separate days for specific, limited identified hours connected to the time and location of certain robberies. The court explained that unlike the information in *Carpenter*, this information did not track the defendant's movements in detail over a lengthy period or the substance of the communications.

Relying on *Walker* and *Rhodes*, in *State v. Elias*,[81] we recently held that the defendant had no reasonable expectation of privacy in his cell phone location information obtained from the cell tower nearest the scene of the crime. The information was limited to a period of time 15 minutes before the crime through 15 minutes after.

No cell site location information relating to Rush's cell phone was obtained without a warrant. The subpoena neither sought nor obtained cell site location information. Relevant to obtaining the warrant, the subpoena obtained cell phone records showing that Marques and Rush spoke on the phone twice the morning of the murder and robbery and exchanged text messages on March 2, 2021. The majority of the information set forth in the affidavit supporting the search warrants was discovered during law enforcement's independent investigation into Shekie's death and not through Rush's cell phone records. The subpoena did not seek, nor did it obtain, the content of these communications. We find it insignificant that the subpoena sought "IP Destination and Sessions," since no cell

[80] *United State v. Rhodes*, No. 1:19-CR-73-AT-LTW, 2021 WL 1541050 (N.D. Ga. Apr. 20, 2021).

[81] *State v. Elias*, 314 Neb. 494, 990 N.W.2d 905 (2023).

phone information indicative of Rush's physical movements was obtained without a warrant.

We find no merit to Rush's argument that there is a reasonable expectation of privacy in all cell phone records maintained by the cell phone service provider. In making this argument, Rush relies on our opinion in *State v. Jennings*.[82] In *Jennings*, the State had acquired the defendant's cell site location information without a warrant. No other cell phone information was apparently at issue on appeal. We said that the defendant had correctly asserted that under *Carpenter*,[83] the warrantless "seizure of his cell phone records and [cell site location information] was a violation of his Fourth Amendment rights."[84] Because *Carpenter* had not yet been decided at the time of the search, however, the exclusionary rule did not apply.

[42] It is not clear what "cell phone records" in *Jennings* we were referring to apart from the cell site location information.[85] In any event, there is no indication that we were referring to non-content-based call and text logs maintained by the cell service provider. *Jennings* did not overrule *State v. Knutson*.[86] As recognized in *Carpenter*, cell phone logs fall within the traditional ambit of the third-party doctrine. A cell service customer does not have a reasonable expectation of privacy in the records maintained by a third-party service provider of the phone numbers that text messages or calls were sent to or received from or in the times when those communications took place.

[43] As a matter of law, counsel is not ineffective for failing to make an objection that has no merit.[87] Because there was no reasonable expectation of privacy in the cell phone

---

[82] *State v. Jennings, supra* note 2.

[83] *Carpenter v. United States, supra* note 68.

[84] *State v. Jennings, supra* note 2, 305 Neb. at 820, 942 N.W.2d at 764.

[85] See *id*.

[86] See *State v. Knutson, supra* note 70.

[87] See *State v. Tyler*, 301 Neb. 365, 918 N.W.2d 306 (2018).

records law enforcement obtained by subpoena and utilized in affidavits supporting requests for warrants that ultimately obtained Rush's cell site location information, trial counsel was not ineffective for failing to object to the admission of that evidence at trial. There is no contention on appeal that the warrants lacked probable cause. For similar reasons, the trial court did not commit a miscarriage of justice by admitting into evidence at trial Rush's location information; therefore, we refuse to exercise our discretion to find plain error in the admission of these records.

### (d) Fields' Identification of
### Rush in Video Footage

Rush argues trial counsel was ineffective for failing to object on the ground of lack of foundation to Fields' identification of Rush in the apartment surveillance footage, because Fields allegedly lacked sufficient personal knowledge of Rush's appearance to do so. Because of this alleged lack of foundation, Rush also argues the trial court committed plain error in allowing Fields to identify Rush. We disagree with these contentions.

[44] Fields testified that he interviewed Rush in Chicago and collected buccal swabs from him in Lincoln. He explained that there are places in the video where the face of the man in question is visible in profile and that he could positively identify that man as Rush. Fields also testified that he had seen Rush wearing the same clothing the man in the video wore. This was sufficient foundation for Fields to identify Rush. While Rush argues that Fields' time with him was limited, questions about the extent of a witness' familiarity with the defendant's appearance go to the weight of the testimony and not its admissibility.[88]

[45] Furthermore, both Marques and Feilen independently identified Rush as the man in the video and Rush does not

---

[88] See *People v. Leon*, 61 Cal. 4th 569, 352 P.3d 289, 189 Cal. Rptr. 3d 703 (2015).

take issue with their testimony. The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[89]

Trial counsel was not ineffective in failing to object to Fields' identification of Rush, and the trial court did not commit plain error in admitting Fields' testimony.

### (e) Photograph of Shekie Smiling

Rush asserts plain error and ineffective assistance of trial counsel in relation to the admission of a photograph of Shekie wearing a hardhat and smiling. The photograph was offered by the State to enable several witnesses, two of whom knew Shekie only by appearance and not by name, to identify him. At no point during trial did the prosecution ask witnesses in relation to the photograph about Shekie's character. Defense counsel did not object to the admission of the photograph. On appeal, Rush argues admission of the photograph was not necessary, because the identity of the victim was undisputed and other photographs, which Rush apparently believes to be less sympathetic, could have been used instead. Rush argues he was unfairly prejudiced because the photograph "served to paint Shekie as a hardworking and kind man and draw the jury's sympathy."[90]

[46,47] The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect.[91] A relevant photograph should not be excluded from evidence unless its prejudicial effect is greater than its probative value.[92]

---

[89] See *State v. Kidder*, 299 Neb. 232, 908 N.W.2d 1 (2018).

[90] Brief for appellant at 46.

[91] *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999).

[92] *State v. Forster*, 616 S.W.3d 436 (Mo. App. 2020).

[48,49] In a homicide prosecution, photographs of a victim may be received into evidence for, among other things, purposes of identification.[93] It is generally agreed that a photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification, even if there exists no dispute over the identity of the deceased.[94] "[T]he state is not required to prove its case shorn of photographic evidence merely because the defendant agrees with a witness or stipulates to a fact."[95]

Without providing any apposite authority, Rush assumes that to be admissible for identification purposes, an in-life photograph of a victim must be devoid of any humanizing or positive attributes that give insight into the person whose life has been lost. But an otherwise relevant photograph of the victim in life need not be excluded despite the possibility it could elicit a sympathetic response from the jury.[96]

For example, in *State v. Forster*,[97] the appellate court held that the trial court did not err in admitting a photograph of the victim in his police uniform, identified by his wife at trial, because its relevancy outweighed any danger of unfair prejudice. Similarly, in *Browning v. State*,[98] the appellate court found it reasonable for defense counsel not to object to the admission of an in-life photograph of the victim with a small child on his lap. The court rejected the defendant's argument that the photograph amounted to victim impact evidence and discerned nothing prejudicial or inflammatory about the photograph.

---

[93] See *State v. Clark, supra* note 44.

[94] See *Russell v. State*, 272 So. 3d 1134 (Ala. Crim. App. 2017).

[95] *People v. Boyette*, 29 Cal. 4th 381, 424, 58 P.3d 391, 419, 127 Cal. Rptr. 2d 544, 577 (2002) (internal quotation marks omitted).

[96] *People v. Parker*, 13 Cal. 5th 1, 510 P.3d 404, 293 Cal. Rptr. 3d 813 (2022).

[97] *State v. Forster, supra* note 92.

[98] *Browning v. State*, 120 Nev. 347, 91 P.3d 39 (2004).

In contrast, in *Salazar v. State*,[99] the appellate court held that the danger of unfair prejudice outweighed the probative value of a 17-minute video montage of photographs depicting the murder victim's life and set to music. It held that the trial court abused its discretion in admitting the evidence.

Here we are presented with a simple photograph of the victim smiling and wearing a hardhat. The trial court did not abuse its discretion in admitting the photograph, let alone commit plain error. And because the photograph was not in fact unduly prejudicial, trial counsel was not ineffective in failing to object to it.

## 4. Alleged Ineffective Impeachment

Rush argues that his trial counsel was ineffective by failing to call Feilen's adoptive parents or "any other character witness" to impeach Feilen's character as to truthfulness.[100] While Rush recognizes that trial counsel successfully impeached Feilen during cross-examination by confronting her with numerous prior inconsistent statements to law enforcement, he argues trial counsel was ineffective for "pursuing only this single avenue of impeachment."[101]

[50,51] The alleged failure to call "any other character witness" fails to sufficiently raise a claim of ineffective assistance of counsel. When the claim of ineffective assistance on direct appeal involves uncalled witnesses, vague assertions that counsel was deficient for failing to call "witnesses" are little more than placeholders and do not sufficiently preserve the claim.[102] Appellate counsel must give on direct appeal at least the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial

---

[99] *Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002).

[100] Brief for appellant at 60.

[101] *Id*.

[102] *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022).

counsel.[103] Such specificity is necessary so that a postconviction court may later identify whether a particular claim of failing to investigate a witness is the same one that was raised on direct appeal.[104]

[52] In contrast, the alleged ineffective assistance in failing to call Feilen's adoptive parents was sufficiently raised. An appellate court does not need specific factual allegations as to what an uncalled person or persons would have said, which will not be found in the appellate record.[105]

Rush claims that testimony by Feilen's adoptive parents about her poor character as to truthfulness "would have provided a more convincing impeachment."[106] However, defense counsel's impeachment of Feilen was extensive. She was confronted with numerous statements to law enforcement that she admitted were lies. Feilen acknowledged during cross-examination that she had said she lies "all the time."

In other circumstances, we might not be able to resolve this claim on direct appeal, since the record does not tell us what instances of dishonesty Feilen's adoptive parents could have testified about. However, in this instance, the impeachment of Feilen by her own inconsistent statements and admissions was so complete that the record conclusively demonstrates trial counsel was not constitutionally deficient by failing to conduct more impeachment through the testimony of Feilen's adoptive parents. We find no merit to this assignment of error.

### 5. PREPARATION OF RUSH TO TESTIFY

Rush also argues that trial counsel was ineffective by "inadequately prepar[ing] Rush to testify."[107] Rush's appellate counsel argues that Rush's "combative stance toward

---

[103] See *id.*

[104] *Id.*

[105] *Id.*

[106] Brief for appellant at 60.

[107] *Id.*

the prosecutor" and "off-color statements" while testifying in his own defense evidenced that his trial counsel was "prejudicially ineffective for failing to properly prepare Rush to testify."[108] Appellate counsel argues this prejudiced Rush because he undermined his own credibility in testimony that was essential to his alibi defense, such as that he was apart from his cell phone on the night of the robbery and that he was with Young when the robbery occurred. Rush also points to his testimony that he did not participate in a controlled call with Feilen, did not accuse Marques of having "ratted [him] out," and no longer owned "black Jordan shoes" by the time the robbery occurred.

It is, of course, entirely possible that Rush's behavior while testifying was not a result of constitutionally deficient preparation by trial counsel. Still, the record on appeal does not contain trial counsel's testimony or any other evidence demonstrating how trial counsel did or did not prepare Rush to testify. In *State v. Young*,[109] we addressed a similar claim that trial counsel was ineffective in "failing to adequately prepare [the defendant] to testify," resulting in impeachment that could have been avoided. We held that the record on direct appeal was inadequate to review the claim.[110] Likewise, here, the record is insufficient to determine whether trial counsel was ineffective in his preparation of Rush to testify in his own defense.

[53,54] The State asserts we can determine on direct appeal as a matter of law that there was no prejudice, even if trial counsel was ineffective in his preparation of Rush to testify. However, we have repeatedly observed that the trial record reviewed on appeal is devoted to issues of guilt or

---

[108] *Id*. at 30.

[109] *State v. Young*, 279 Neb. 602, 610, 780 N.W.2d 28, 36 (2010). See, also, *State v. Johnson*, No. A-20-048, 2021 WL 243792 (Neb. App. Jan. 26, 2021) (selected for posting to court website).

[110] *State v. Young, supra* note 109.

innocence and does not usually address issues of counsel's performance.[111] Furthermore, it is not usually an appellant's allegations of prejudice that have guided review of ineffective assistance claims on direct appeal, but the allegations of deficient conduct.[112] We cannot determine as a matter of law on direct appeal that because of a lack of corroborating evidence of Rush's alibi, Rush's allegedly inadequate preparation for trial, which undermined his credibility as the sole witness supporting his alibi defense, did not prejudice him.

### 6. Domestic Assault

Several of Rush's remaining assignments of error pertain to the alleged undermining of his ability to prove, through other evidence, his alibi that he was assaulting Young in Omaha at the time of the robbery and murder.

Rush argues that trial counsel was ineffective for failing to "adequately pursue" the alibi defense that he was assaulting Young in Omaha at the time of the murder and robbery in Lincoln.[113]

Rush assigns that "the district court clerk committed plain error" by failing to properly issue defense counsel's subpoena of Bruning, who received Young's report of the domestic assault on February 24, 2021, and did not appear to testify at trial. Rush also assigns that the prosecution committed misconduct by interfering with the subpoena of Bruning. Neither of these assignments are independently cognizable claims of error by the trial court.[114] However, we will consider these allegations in relation to Rush's assignment of error that trial counsel was ineffective in withdrawing a motion for new trial based on the clerk's failure to properly subpoena Bruning and on the alleged prosecutorial interference with the same.

---

[111] See, e.g., *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[112] See *id.*

[113] Brief for appellant at 31.

[114] See Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2022).

Rush assigns that the prosecutor committed misconduct during closing arguments by knowingly making false statements pertaining to the lack of evidence supporting Rush's alleged alibi of domestic assault. This, also, is not a cognizable stand-alone assignment of error. However, we will address Rush's related assignments that (1) the district court committed "plain error" by denying trial counsel's motion for mistrial and (2) trial counsel was ineffective for withdrawing his motion for new trial pertaining to the alleged prosecutorial misconduct.

### (a) Failure to Properly Pursue Alibi Defense

The appellate record is insufficient to resolve Rush's assignment that trial counsel was ineffective in his pursuit of an alibi defense, which claim is sufficiently raised only as to trial counsel's failure to call Young to testify in support of Rush's alibi defense.

Rush initially filed a notice of alibi. Later, however, defense counsel told the court he was not pursuing an alibi instruction. Defense counsel reasoned that even if he proved Rush assaulted Young the day of the robbery and murder, the evidence would show that there was time for Rush to get to Lincoln to commit the crimes there. Whereas defense counsel had thought Young and her roommates were going to testify to a more precise time of the assault that was favorable to the defense, he told the court these witnesses all "flaked out," i.e., would not testify. As a result of this development, defense counsel told the court he was not going to ask for an alibi instruction.

In his brief on appeal, Rush asserts trial counsel failed to "adequately pursue an alibi defense."[115] Standing alone, this is a conclusory assertion that is not a sufficiently specific

---

[115] Brief for appellant at 62.

argument of ineffective assistance of counsel.[116] However, appellate counsel elaborates that trial counsel was ineffective by failing to "secure[] the attendance" of Young and the other "multiple eyewitnesses" to the domestic assault, who "were apparently available at some time."[117] He thus argues that trial counsel "made insufficient efforts to secure alibi witnesses for trial."[118] He alleges Rush was prejudiced because Rush was left as the only witness who provided evidence of an alibi.

As already stated, to effectively raise on direct appeal a claim of ineffective assistance of trial counsel in relation to the failure to call witnesses, appellate counsel must give on direct appeal the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial counsel.[119] In *State v. Mora*,[120] we found that appellate counsel's reference to trial counsel's failure to call "character witnesses," even with some allusion to what they would have said, was insufficiently specific to raise a claim of ineffective assistance on direct appeal. Likewise, here, Rush's references to "multiple eyewitnesses"[121] to the domestic assault and to "alibi witnesses"[122] are insufficiently specific to effectively raise a claim of ineffective assistance on direct appeal based on the failure to call witnesses.

In contrast, Rush has sufficiently raised a specific claim that trial counsel was ineffective by failing to call Young to testify about the domestic assault and when it occurred. However, the appellate record does not tell us how Young "flaked out."

[116] See *George Clift Enters. v. Oshkosh Feedyard Corp.*, 306 Neb. 775, 947 N.W.2d 510 (2020).

[117] Brief for appellant at 31.

[118] *Id*. at 62.

[119] See *State v. Lee, supra* note 59. See, also, *State v. Blake, supra* note 102; *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[120] *State v. Mora*, 298 Neb. 185, 201, 903 N.W.2d 244, 258 (2017).

[121] Brief for appellant at 31.

[122] *Id*. at 62.

Nor does it tell us how impactful her testimony would have been in support of Rush's alibi defense. Therefore, we find that Rush's claim that trial counsel was ineffective for failing to call Young to support his alibi defense cannot be determined on direct appeal.

#### (b) Withdrawal of Motion for
#### New Trial re Subpoena

We next consider whether trial counsel was ineffective in withdrawing Rush's motion for new trial in relation to Bruning's subpoena. Rush argues that a new trial was warranted because the clerk's alleged plain error and the State's alleged misconduct in interfering with the subpoena deprived him of evidence that would have supported his alibi. Under Neb. Rev. Stat. § 25-1142 (Reissue 2016):

> The former verdict, report, or decision shall be vacated and a new trial granted on the application of the party aggrieved for any of the following causes affecting materially the substantial rights of such party: (1) Irregularity in the proceedings of the court, jury, referee, or prevailing party or any order of the court or referee or abuse of discretion by which the party was prevented from having a fair trial; (2) misconduct of the jury or prevailing party; (3) accident or surprise, which ordinary prudence could not have guarded against; (4) excessive damages, appearing to have been given under the influence of passion or prejudice; (5) error in the assessment of the amount of recovery, whether too large or too small, if the action is upon a contract or for the injury or detention of property; (6) that the verdict, report, or decision is not sustained by sufficient evidence or is contrary to law; (7) newly discovered evidence, material for the party applying, which the moving party could not, with reasonable diligence, have discovered and produced at the trial; and (8) error of law occurring at the trial and excepted to by the party making the application.

Rush does not clearly explain on what statutory grounds the motion would have had merit, but presumably he is appealing to the grounds of unfair surprise and alleged misconduct by the State.

There is no evidence that the State committed misconduct in relation to the subpoena, and Rush does not assign or argue that trial counsel was ineffective for failing to present further evidence that would have established such misconduct. During the trial and at the hearing on the motion for new trial, there was no suggestion that the prosecutor did not in fact tell Bruning he had to honor any subpoena by the defense. Indeed, the prosecutor's report of this conversation with Bruning is reiterated in defense counsel's affidavit that was entered into evidence at the hearing on the motion for new trial.

Further, contrary to appellate counsel's assertion, there was no evidence that the State intentionally sent Bruning the defense's subpoena or even realized it had done so. Rather, the prosecutor said, "[W]e sent two subpoenas to [Bruning] by mistake." There was no evidence that the State otherwise acted with the purpose of preventing Bruning from testifying at trial. The record simply does not support appellate counsel's claim that the prosecution acted intentionally to "thwart any efforts to introduce Bruning's police report, or the arrest warrant based on that report."[123]

While defense counsel may have been initially surprised by the clerk of the court's errors in relation to the subpoenas, defense counsel admitted that he was aware at trial that Bruning was not going to appear and had discussions with the clerk of the court about what had occurred. Despite this, defense counsel did not ask for a continuance to have Bruning properly subpoenaed and brought in by warrant if necessary.

[55] We have repeatedly held that a motion for new trial on the ground of surprise is properly overruled where a request

_____

[123] Brief for appellant at 58.

for a continuance for that reason was not made at the trial.[124] In a similar case, *Schroll v. Fulton*,[125] we accordingly held that the plaintiff's motion for new trial was properly overruled despite evidence that a witness was never served and had failed to appear at trial because of a misunderstanding. We reasoned that the plaintiff's counsel had discovered at trial that the witness would not be present and had failed to move for a continuance.[126] Because defense counsel became aware of the issue during trial and did not move for a continuance, the motion for new trial on the basis of surprise had no merit.

We observe in the instant case that trial counsel likely abandoned his pursuit of Bruning's testimony because it was of little consequence to Rush's defense. Bruning could testify only that he made the report based on information given to him. While the import of Bruning's testimony was apparently to enter the warrant obtained in relation to the domestic assault into evidence, defense counsel conceded the warrant would not support an alibi defense. Instead, defense counsel said the purpose of the warrant was to add credibility to Rush's testimony that he fled to Chicago not just because he had learned he was a suspect in the murder and robbery of Shekie, but also because he knew he had a warrant for his arrest in relation to the domestic assault. Bolstering Rush's credibility on such a claim was of minor significance to Rush's defense, and the absence of this evidence therefore did not materially affect Rush's substantial rights.

In sum, because the motion for new trial in relation to the subpoena of Bruning had no merit, trial counsel was not ineffective for withdrawing the motion.

---

[124] *Plambeck v. Union Pacific RR. Co.*, 232 Neb. 590, 441 N.W.2d 614 (1989); *Schroll v. Fulton*, 213 Neb. 310, 328 N.W.2d 780 (1983); *State v. Mills*, 199 Neb. 295, 258 N.W.2d 628 (1977); *Kehm v. Dumpert*, 183 Neb. 568, 162 N.W.2d 520 (1968).

[125] *Schroll v. Fulton, supra* note 124.

[126] *Id.*

(c) Alleged Prosecutorial Misconduct
During Closing Arguments

Rush argues that the prosecutor took advantage of the fact that the warrant relating to the report of domestic assault was not in evidence and committed misconduct during closing arguments by knowingly making false statements to the jury that undermined Rush's alibi. More specifically, Rush argues that the prosecutor told the jury there was "absolutely nothing" corroborating the existence of the domestic assault warrant and Rush's testimony that he was with Young at the time of the robbery and murder.[127]

Rush argues that, accordingly, the trial court erred in overruling his motion for mistrial. We observe that Rush's argument differs from his assignment of error because he assigns "plain error," rather than reversible error by the trial court. Because we ultimately conclude there was no prosecutorial misconduct, this distinction is insignificant. We find that the court committed neither reversible error nor plain error in this respect. For similar reasons, we find no merit to this assertion that counsel was ineffective by withdrawing his motion for new trial based on prosecutorial misconduct.

[56,57] In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper.[128] If the remarks are found to be improper, it is then necessary to determine whether the improper remarks had a prejudicial effect on the defendant's right to a fair trial.[129] Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.[130] The decision whether to grant a motion for

---

[127] Brief for appellant at 28.

[128] *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024).

[129] *Id*.

[130] *State v. Robinson, supra* note 9.

mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion.[131]

It is important to view the prosecution's statements in context. While the prosecutor repeatedly referred in closing arguments to there being "nothing to corroborate" various aspects of Rush's testimony that the prosecutor discussed, these were true statements.

During the prosecution's closing arguments, the prosecutor reviewed with the jury Rush's version of events around the time of the murder and robbery. The prosecutor talked about how Rush claimed the messages about having to "lay low" were "just in regard to" the domestic assault that occurred on February 23, 2021, which the prosecutor pointed out was "coincidentally at the same time that this homicide occurred." The prosecutor then began to talk about Rush's testimony that he had lost his cell phone or had left it in Marques' vehicle and said:

> There's nothing to support that, no corroboration of that testimony that he left—[Marques] wasn't asked that question about finding a phone in his van, and, what, three— what, five days later, from the 15th or the 16th or the 20th, and then all of a sudden, the 24th, his dog finds it out by the street.

The prosecutor also talked about Rush's unlikely story that his social media accounts had been compromised and Rush's supposition that Feilen was talking to some other man during the controlled phone conversation made in cooperation with law enforcement.

The prosecutor then moved on to the testimony of Feilen and Marques and pointed out that although they were both engaged in criminal behavior and perhaps not the best witnesses, there were things that corroborated their versions of the events. The prosecutor said, in contrast, "I would tell you

---

[131] *Id.*

that there is absolutely nothing that corroborates anything that . . . Rush said." The prosecutor elaborated, "So, what do I mean by that?" and proceeded to detail how Feilen's and Marques' reports of events to law enforcement were consistent with other evidence later discovered during the investigation.

After detailing this incriminating evidence, the prosecutor talked about the shoeprint on Shekie's door and Rush's testimony that he had sold the shoes and did not own them at the time of the murder, pointing out that there was "[n]o corroboration for that whatsoever." Similarly, with respect to the dogs' finding Rush's cell phone that he said he lost, the prosecutor said, "[T]here's no corroboration for that whatsoever."

Only after all this did the prosecutor circle back to the domestic assault. Pertaining to the alibi of the domestic assault, the prosecutor argued there was nothing corroborating Rush's testimony of the exact time of the domestic assault, and he pointed out it would take only approximately 45 minutes to 1 hour to drive from Omaha to Lincoln.

The prosecutor did not assert there was nothing corroborating the existence of an arrest warrant for a domestic assault or that there was nothing corroborating the fact that Rush assaulted Young in Omaha sometime on or around the day Shekie was murdered in Lincoln. To the contrary, the prosecutor speculated that the domestic assault occurred on February 24, 2021, during the evening hours. The prosecutor speculated that Young was upset with Rush for being with Feilen on February 23 and maybe had even found out about the murder. He speculated that a fight ensued that led to the domestic assault charges.

"But," said the prosecutor, "there's absolutely nothing that corroborates when, where, and how that happened." The prosecutor said, "The whole [domestic violence] thing, as far as what happened at the same time that this murder occurred in the early morning hours of the 23rd, there is absolutely no corroboration to show when, what, where, or how that

warrant came about." The prosecutor continued, "[Rush] said there was a warrant for his arrest. There's nothing to support how that all came about."

In other words, viewed in their entirety and in context, the prosecutor's closing arguments did not dispute that there was a warrant related to the domestic assault or even that the domestic assault happened. Rather, the prosecutor disputed whether the domestic assault happened "at the same time that this murder occurred." The "when, what, where, or how" comment may have been hyperbole, but, viewed in context, it would not communicate to a reasonable juror that the prosecutor was asserting there was no corroboration of the fact that a report of domestic assault was made around the time of the robbery and murder or the fact that a warrant for Rush's arrest resulted from the same.

That there was no corroboration of Rush's testimony that the assault occurred at the same time as the murder was a true statement. In the sidebar during Rush's testimony, defense counsel expressly recognized that the arrest warrant reflected only the date Bruning responded to the report of the offense and not necessarily the date the offense occurred. And there was no indication that Bruning's testimony would have provided anything other than inadmissible hearsay with respect to exactly when the domestic assault, as opposed to Young's report of it, occurred.

The prosecutor was not being false or misleading in stating there was nothing to corroborate Rush's alibi testimony about the time of the assault. A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[132] As such, the trial court did not err in denying Rush's motion for mistrial and trial counsel did not err in withdrawing the motion for new trial on the ground of prosecutorial misconduct.

---

[132] *State v. Garcia, supra* note 57.

### 7. Stipulation to Mistrial Because
### of COVID-19 Delays

[58] We next address Rush's assignment of error that defense counsel was ineffective by stipulating to the State's motion for mistrial related to COVID-19, which occurred shortly after the first trial began. A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[133] As stated, decisions regarding motions for mistrial are directed to the discretion of the trial court.[134]

After the jury was impaneled, opening statements were given by both parties, the State called two witnesses, and trial was delayed for several days after the judge and three of the State's witnesses yet to testify tested positive for COVID-19. The jury was unsequestered, and it was still unclear when the judge would be asymptomatic and test negative for COVID-19. The State, in its motions for mistrial, raised concerns about the jurors' ability to have a fresh recollection of the arguments and evidence presented and its ability to secure witnesses beyond the period of their subpoenas, based on the original estimation of the duration of the trial.

Rush discussed the motion with defense counsel and stipulated to the facts set forth in the motion. He did not object to a mistrial. The court declared a mistrial and scheduled a new trial. In its order, the court found that a mistrial was necessary to avoid manifest prejudice and injustice to both Rush and the State.

To make a successful claim that trial counsel was ineffective, the defendant must show both that counsel's performance was deficient and that the deficient performance caused

---

[133] *State v. Esch, supra* note 22.

[134] *Id.*

prejudice.[135] But Rush presents no specific argument on appeal as to how his defense counsel was deficient. His vague reference to the stipulation's being "apparently based in part on [counsel's] personal feelings about pandemics"[136] is not a coherent argument of deficient conduct.

Rush focuses only on the argument that he was prejudiced because his opening statements revealed his theory of defense and the mistrial gave the State more time to prepare to rebut that theory. Even assuming Rush suffered some disadvantage from the mistrial, it does not follow that trial counsel's performance in stipulating to the facts and failing to object to the mistrial was deficient performance. It also does not follow that the court would have abused its discretion in granting a mistrial but for defense counsel's stipulation and failure to object.

In several cases in state and federal courts, mistrials granted by the court because of delays in trial due to COVID-19, especially when of indeterminate length, have been held to be not only proper, but of manifest necessity.[137] Trial counsel is not deficient for failing to object to a mistrial where a mistrial was warranted.

We find no merit to Rush's assignment of error that trial counsel was ineffective in relation to the mistrial granted due to delays from COVID-19.

## 8. Sufficiency of Evidence of Use of Firearm to Commit Felony

Rush's final challenge on appeal is that the evidence was insufficient to support his conviction of use of a firearm to

---

[135] See *State v. Ammons*, 314 Neb. 433, 990 N.W.2d 897 (2023).

[136] Brief for appellant at 31.

[137] See, *U.S. v. Islam*, 102 F.4th 143 (2024); *U.S. v. Dennison*, 73 F.4th 70 (1st Cir. 2023); *Hightower v. State*, 315 Ga. 399, 883 S.E.2d 335 (2023); *State v. Smith*, 465 N.J. Super. 515, 244 A.3d 296 (2020).

commit a felony. Under § 28-1205(1), "[a]ny person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony" and "[u]se of a deadly weapon, which is a firearm, to commit a felony is a Class IC felony." He argues the evidence was insufficient because there was no physical evidence linking him to a firearm.

[59] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact.[138] The relevant question for an appellate court in reviewing a criminal conviction for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[139]

[60] Under the evidence presented, any rational trier of fact could have found the essential elements of use of a firearm to commit a felony. As Rush concedes, it was undisputed that Shekie was killed by gunshot wounds. Shell casings and bullets were found in and near his trailer. Feilen and Marques both testified that Rush had a gun during the robbery and that they heard gunshots and Shekie scream after Rush entered Shekie's trailer. It does not matter that this evidence is circumstantial. Circumstantial evidence is entitled to be treated by the trier of fact in the same manner as direct evidence.[140] Nor do we pass on the credibility of these witnesses. We find no merit to Rush's contention that there was insufficient

---

[138] *State v. Clark, supra* note 44.

[139] See *id*.

[140] *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981).

evidence to support his conviction of use of a firearm to commit a felony.

## VI. CONCLUSION

We find that we cannot resolve on direct appeal Rush's claims of ineffective assistance of counsel by failing to call Young to testify as to Rush's alibi and by failing to adequately prepare Rush to testify in his own defense. As to all other assignments of error, we find that they lack merit. We affirm the judgment of the district court.

Affirmed.